*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0235**

State of Minnesota,
Respondent,

vs.

Robert Jon Hill,
Appellant.

**Filed February 9, 2026**
**Affirmed in part, reversed in part, and remanded**
**Harris, Judge**

Scott County District Court
File No. 70-CR-23-8852

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Ronald Hocevar, Scott County Attorney, Elisabeth M. Johnson, Assistant County Attorney, Shakopee, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Evan Ottaviani, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Smith, Tracy M., Presiding Judge; Harris, Judge; and

Florey, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**HARRIS**, Judge

In this appeal from a final judgment following a jury trial, appellant challenges his convictions of domestic assault, arguing that: (1) the evidence is insufficient to support his convictions of domestic assault-fear and domestic assault-harm, (2) the district court abused its discretion by issuing a domestic-abuse no-contact order (DANCO) during his sentencing hearing and by naming R.H. as a protected victim, and (3) the district court violated appellant's substantive and procedural due-process rights by not holding a separate DANCO hearing, and prohibiting all contact between Hill and his minor daughter. Applying the circumstantial-evidence standard, we conclude that the evidence was sufficient to support Hill's conviction of domestic assault-fear. However, the district court violated Hill's procedural due-process rights by issuing a DANCO naming R.H. as a protected person. The district court also erred by entering convictions for two offenses arising from a single criminal act, in violation of Minnesota Statutes section 609.04, subdivision 1 (2022). Accordingly, we affirm in part, reverse in part, and remand.

## FACTS

Respondent State of Minnesota charged appellant Robert Jon Hill with one count of domestic assault-fear and one count of domestic assault-harm under Minnesota Statutes section 609.2242, subdivisions 1(1) and 1(2) (2022)[1]. The charges arose from a July 2023

---

[1] The state also charged Hill with threats of violence under Minnesota Statutes section 609.713, subdivision 1 (2022). He was later found not guilty of that charge.

incident in which Hill physically assaulted L.L.  The matter proceeded to a jury trial.  The following facts summarize the trial evidence in a light most favorable to the jury's verdict.

*June 2023 Domestic Assault*

In June 2023, an argument between Hill and L.L., who were in a relationship, arose after Hill discovered that L.L. had eaten a donut that Hill wanted for himself.  L.L. was in their bedroom watching television when Hill confronted L.L.  Unbeknownst to Hill, L.L. began recording the argument.  Hill began yelling at her and threw his cellphone at her leg.  L.L. then moved to the living room where their minor daughter, R.H. was present.[2]  Hill began hitting L.L.'s dogs and chased the dogs with a broomstick.  When L.L. told him to stop, Hill replied, "You're *done*.  Do you understand me?  You better fear me." (Emphasis added.)  Hill then said, "I'm threatening you.  I ain't threatening you, I'm promising you . . . . I'll go after your farm.  I'll go after you.  I'll go after every f-cking thing you got.  Try me.  It ain't a f-cking threat.  I'll bury your ass."  Hill then approached L.L. where she sat on the couch beside R.H., leaned over L.L., and spat in her face.

During the argument, Hill threatened to destroy an heirloom doll that L.L. received from her father.  Hill opened the cabinet where the doll was located, and L.L. tried to stop him.  Hill then hit her in the face, saying, "Don't you grab me by my f-cking hair, don't you grab me by my f-cking hair and think you're not going to get f-cking touched back."

---

[2] The couple's 17-year-old son, J.H. was also in the house during the argument.  J.H. could hear yelling and loud noises from his room in the basement but could not hear the specific words being said.  J.H. observed the bruises on L.L. after she had been hit by Hill.

When the altercation ended, Hill directed his attention to R.H., who was present during the altercation, and said to her:

> Please take your drink and go on and go to bed. Mom and I are done. I'm not going to talk to her. She's not going to talk to me. But I want you to go in your room because this is volatile, and this is something that you shouldn't be a part of. All that said, I'm going in there to go to bed, and your mom can sit out here and cry and wallow in her own shit. Because she's a f-cking fat pig, she doesn't give a f-ck about nobody.

Hill then leaned close to L.L. and whispered, "F-ck off and kill yourself. I pray that you die."

### *Hill's Arrest*

That evening, L.L. sent the audio recording of the altercation to a family member, who turned the recording in to the police. Five days later, police officers began monitoring Hill's residence. The officers observed Hill and L.L. leave their home and enter Hill's car. As Hill began to drive away, the officers conducted a routine traffic stop of Hill's car for an inoperable passenger-side brake light and missing rear license plate. Officers arrested Hill after discovering his driver's license was canceled as inimical to public safety. During the traffic stop, L.L. was visibly frightened and refused to speak with the officers. Eventually, L.L. exited the vehicle and officers observed a bruise over her left eye and bruising on her legs. The officers asked L.L. how she got the bruises, and L.L. told the officers that Hill had hit her. The officers then cited Hill for driving with a canceled driver's license and, later, formally charged him for domestic assault-fear and domestic assault-harm.

4

At Hill's first appearance, the district court issued a pretrial domestic-abuse no-contact order (DANCO) prohibiting Hill from contacting L.L. and their minor daughter, R.H.  The district court did not conduct a separate hearing specifically addressing the DANCO, as required under Minnesota Statutes section 629.75, subdivision 1(4)(c) (2024).  Although the DANCO that was issued prohibited Hill from having contact with R.H., the transcript of the hearing reflects that the district court informed Hill that the DANCO applied to L.L. only and that he was permitted to have contact with their minor daughter, R.H.  With respect to the DANCO, the following exchange occurred between Hill and the district court at the first appearance:

> THE COURT: [ . . . ] I'll hear from the State, please, on conditions.
>
> THE STATE: Your Honor, State is asking for . . . no contact with the victim or kids.  I would ask the Court to sign a DANCO in this matter . . . .  The victim's initials are L.L.
>
> THE COURT: Okay.
>
> . . . .
>
> THE COURT: . . . Mr. Hill, did you hear the - sorry.  Yeah.  Do we have a DANCO for him?  . . . All right.  Mr. Hill, did you hear the terms, the bail conditions that the State has asked me to impose?
>
> HILL: I heard that there was no contact with L.L., but I didn't hear, there was another part prior to that.  If you could repeat that.
>
> THE COURT: Yeah.  So the State has asked that I set bail at $30,000 bond or $3,000 cash alternative, subject to the conditions that you have . . . *no contact with the alleged victim, L.L.*  Do you know who that is?

HILL: I do. It's a little difficult when we have kids together and I live with her.

THE COURT: Okay. I would sign a domestic abuse no contact order *that would prevent you from having any contact with L.L.* or from going to the residence there . . . . Anything that you'd like to say before I set the conditions?

HILL: Just, if you could explain the condition of how I get my vehicle, some clothes.

. . . .

THE COURT: Yeah. The domestic abuse no contact order, I would check a box that would say that you can go back to the house once with a sheriff or police escort to get any personal belongings that you might need in the short term, okay.

HILL: Okay. Yes, Your Honor. I understand.

THE COURT: Okay. Anything else you'd like to tell me, sir?

HILL: Not at this time.

THE COURT: No? Okay. So I'm going to set bail as follows: I am going to set $30,000 bond or $3,000 cash, subject to the conditions that I mentioned . . . . no contact with the alleged victim, L.L. . . . . we're going to give to the deputy through the slot a, the domestic abuse no contact order . . . . And, sir, just want to verify that you received a, the copy of the domestic abuse no contact order *that prohibits you from having contact with L.L.* or going back to that residence . . . . So, Mr. Hill, just want to verify that you were served with a copy of the domestic abuse no contact order, correct?

HILL: Yes . . . . I do have one question, Your Honor . . . . Before I'm excused . . . . And that is, I do have children in this case, and I'd like to be able to see my daughter, and so I'd like to know how that works.

THE COURT: Yeah.  There's no prohibition on you seeing the children in the domestic abuse no contact order, but you can't go to the house.

HILL: I understand, Your Honor.  Thank you.

The pretrial DANCO was to remain in effect until the disposition of the criminal case or until further order or modification.  At multiple subsequent hearings, Hill was provided inconsistent and conflicting information concerning the scope of the pretrial DANCO.

### October 2024 Jury Trial

At trial, the state presented testimony from L.L., the couple's son, J.H., and three police officers who observed L.L. on the day of Hill's arrest.  The state also played the audio recording to the jury.  On direct examination, L.L. testified about the events that occurred leading up to the assault.  L.L. testified that Hill began yelling at her and that the yelling lasted for roughly 20 minutes.  L.L. testified that she became increasingly afraid that Hill would hit her as the argument escalated.  J.H. testified that after the assault, L.L. came down the stairs and he observed that her left eye was swollen and puffy and noticed the bruising on her leg.  The police officers also testified that they observed the bruises on L.L.'s left eye and legs following Hill's arrest.  The jury found Hill guilty of domestic assault-fear of immediate bodily harm or death and domestic assault-harm but found him not guilty of threats of violence.

### January 2025 Sentencing Hearing

In January 2025 the parties appeared for a sentencing hearing.  The district court began the hearing by asking the parties if there were any additions or corrections to the

7

presence investigation. The state requested a two-year probationary DANCO, noting in part that, "Mr. Hill has some serious anger problems that I do believe require supervision, and I want the DANCO to be in place as long as possible." The district court then asked the state if it had any communication or statement from the victim. The state responded that it had communication with the victim and stated, "She still wants a DANCO, she doesn't want any communication with Hill."

The district court then turned to Hill's counsel for a response. He insisted on a one-year probationary period, as recommended by the presentence investigation. He also stated, "The other issue that we have is related to the issue of a probationary DANCO. Mr. Hill would request that the Court issue a limited probationary DANCO allowing him contact with the victim as to coordinating visits or communication with his child, and allowing him contact with his child." Hill's counsel discussed the current custody case pending in tribal court and Hill's lack of contact with his daughter. He ultimately requested that the district court issue a limited DANCO allowing contact with the victim as it related to his daughter. When the district court elicited comments from Hill, he discussed missing his daughter and his desire to see her.

The district court entered convictions on both counts but sentenced only on count 2, domestic assault-fear. The warrant of commitment reflects that the district court entered convictions on both count 2 domestic assault-fear and count 3 domestic assault-harm. However, at the sentencing hearing, the district court stated, "In regard to count three, the same course of conduct, essentially a lesser included, and so I am going to not sentence you on that file." On count two, the district court stayed imposition of the sentence

8

pursuant to Minnesota Statutes section 609.135 (2022), placed Hill on two years of supervised probation, ordered that he serve 36 days in the Scott County Jail, and that he complete domestic-abuse treatment. As it related to the DANCO, the district court stated that Hill must "have no contact with the victim L.J.L. and the minor child, R.M.H." The district court further stated that Hill must "comply with all the terms of any active DANCO, Order for Protection, or Harassment Restraining Order." The district court stated, "There is an active DANCO, so I expect you fully to comply with the DANCO." The district court did not independently impose a probationary DANCO.

This appeal follows.

## DECISION

**I.     The evidence is sufficient to support Hill's domestic assault-fear conviction because the circumstances proved are not consistent with a reasonable hypothesis other than guilt.[3]**

Hill argues that his domestic assault-fear conviction is not supported by sufficient evidence under Minnesota Statutes section 609.2242, subdivision 1(1). More specifically, Hill argues that the circumstances proved are consistent with the reasonable inference that Hill "only intended to make L.L. fear that he would take away her property." We are not persuaded.

---

[3] Hill also challenges the sufficiency of the evidence to support the guilty verdict on his domestic assault-harm conviction. We do not address this challenge because the district court should not have adjudicated this. As explained below, it was error to enter a conviction on that count. *See State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979) (declining to address sufficiency of evidence for jury's guilty verdict on offenses of which defendant was not formally adjudicated guilty and for which defendant was not sentenced).

9

### A. Legal Standard

To prove that Hill committed domestic assault-fear, the state must prove, in relevant part, that Hill committed "an act with intent to cause fear in another of immediate bodily harm or death." Minn. Stat. § 609.2242, subd. 1(1). Assault-fear is a specific-intent crime, as evidenced by the legislature's use of the words "with intent to." *State v. Fleck*, 810 N.W.2d 303, 309 (Minn. 2012). "'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2022). Therefore, in order to prove domestic assault-fear, the state needed to prove that Hill acted with the purpose to cause L.L. to fear immediate bodily harm or death.

"[I]ntent is a state of mind that is usually proved with circumstantial evidence." *State v. Balandin*, 944 N.W.2d 204, 217 (Minn. 2020); *State v. Smith*, 825 N.W.2d 131, 136 (Minn. App. 2012) ("Intent is a state of mind that is generally proved by using circumstantial evidence by drawing inferences from the defendant's words and actions in light of the totality of the circumstances." (quotation omitted)); *accord State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000) ("A state of mind generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident."). Here, the state proved intent using circumstantial evidence. Because intent is a state of mind, it is generally proved by considering a defendant's actions "in light of all the surrounding circumstances." *State v. Thompson*, 544 N.W.2d 8, 11 (Minn. 1996).

If circumstantial evidence is used to prove an element of the conviction challenged on appeal, we apply "a heightened two-step standard" of review to the sufficiency of the

evidence. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017); *see also State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, we must "identify the circumstances proved," disregarding evidence inconsistent with the verdict. *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017). We "construe conflicting evidence in the light most favorable to the verdict." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008). Second, we must "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Silvernail*, 831 N.W.2d at 599 (quotation omitted); *see also State v. Collins*, 580 N.W.2d 36, 44 (Minn. App. 1998) ("[F]or a conviction requiring specific intent to stand, such intent must be the only reasonable inference when the evidence as a whole is viewed in the light most favorable to the state."). "We give no deference to the jury's choice between reasonable inferences." *Harris*, 895 N.W.2d at 601. We consider the circumstantial evidence "as a whole" when completing this step of the analysis. *Id.*; *see also State v. Andersen*, 784 N.W.2d 320, 332 (Minn. 2010) ("[W]e do not review each circumstance proved in isolation. Instead, we must consider whether the circumstances presented are consistent with guilt and inconsistent, *on the whole*, with any reasonable hypothesis of innocence." (quotation omitted)).

### B. Circumstances Proved

We begin by identifying the circumstances proved. When viewing all questions of fact in the light most favorable to the guilty verdict, we are left with the following subset of facts as circumstances proved by the state: (1) Hill began yelling at L.L. after discovering that she ate his donut; (2) Hill confronted L.L. in their bedroom; (3) Hill possessed a cell phone when he confronted L.L. in their bedroom; (4) Hill threw the cell phone at L.L.'s

11

leg; (5) L.L. moved to the living room where R.H. was present; (6) Hill leaned over L.L. and spat in her face; (7) Hill stated that he would make L.L.'s life "a living hell"; (8) Hill told L.L. he would call the city and get rid of her dogs; (9) When the dogs started barking, Hill stated, "Don't shut [the dog] up and see what I do"; (10) Hill began to hit L.L.'s dogs and chased them with a broomstick; (11) Hill told L.L., "You're done. Do you understand me? You better fear me"; (12) Hill told L.L., "I'm threatening you"; (13) Hill told L.L. "I'm going to get rid of your house"; (14) Hill told L.L., "I'll go after your farm"; (15) Hill stated, "I'll go after you"; (16) Hill stated "I'll go after every f-cking thing you've got"; (17) Hill stated, "It [isn't] a f-cking threat, I'll bury your -ss"; (18) Hill told L.L. that he would destroy her heirloom doll, stating "I might crush that [doll] with a hammer . . . better yet, I'll do it right in front of you"; (19) Hill stated, "It's time for me to f-ck with you"; (20) Hill stated, "If you f-ck my sh-t over one more f-cking time, I'm going to break your sh-t"; (21) Hill stated, "I'm going to bust that TV that's right behind me"; (22) Hill stated, "I'm going to break all your sh-t right in front of you"; (23) Hill hit L.L. in the face, stating, "Don't you grab me by my f-cking hair and think you're not going to get f-cking touched back. How do you like it?"; (24) Hill stated, "I'm going to go after everything of yours"; (25) Hill leaned in and whispered to L.L., "F-ck off and kill yourself. I pray that you die."

These circumstances proved are consistent with a reasonable inference that Hill acted with intent to cause L.L fear of immediate bodily harm or death. Hill made multiple threats towards L.L., including, "You better fear me," and "It's time for me to f-ck with you" and "It [isn't] a f-cking threat, I'll bury your -ss." Hill's words were also coupled with actions of a physical assault. The natural and probable result of Hill's actions in

12

throwing and hitting L.L with a cell phone and then hitting her in the eye caused L.L. to fear immediate bodily harm and potentially further violence by showing he could take physical action against her.

L.L.'s emotional reaction may also be used as evidence of intent. *Smith*, 825 N.W.2d at 136-37. The jury heard testimony that five days after the incident, when police conducted a routine traffic stop on Hill's vehicle, Hill prevented police from speaking directly with L.L. Police testified that when they eventually spoke with L.L. about the incident, L.L. was "very timid." "She wouldn't look at me. She would look at the ground . . . It was almost like she was trembling. Very, very scared." When police asked L.L. about the bruises they observed on her body, police testified that, "[L.L.] was very reluctant for a while . . . it took a while for her to start to talk to us." *See State v. Andrews*, 388 N.W.2d 723, 728 (Minn. 1986) ("Events both before and after," as well as during the offense, "are relevant to the totality of the circumstances" from which an inference of intent may be drawn).

Now that we have identified the circumstances proved, we must examine "the reasonabless of all inferences that might be drawn from the circumstances proved." *Silvernail*, 831 N.W.2d at 599.

### C.    Reasonable Inferences Other Than Guilt

The second step of the analysis is to determine whether the circumstances proved are consistent with guilt and inconsistent with a reasonable alternative hypothesis of innocence. *Id.* Hill argues that the evidence is insufficient because the circumstances proved are consistent with a finding that Hill "only intended to make L.L. fear that he

13

would take away her property." The state maintains that the entire interaction demonstrates Hill's intent to cause L.L. fear of immediate bodily harm. We agree with the state.

Hill's principal evidence in support of his alternative hypothesis is his statement, "I'll bury your -ss," which he contends referred only to his intent to take a farm L.L. inherited. We are not persuaded. Hill's argument isolates a single statement and fails to account for the totality of the circumstances proved. The audio recording contains approximately sixteen minutes of Hill yelling at L.L., repeatedly using derogatory language and issuing numerous threats in various ways. During the recording, Hill stated that he would make L.L.'s life "a living hell," that she "better fear" him, that he was "threatening" her, that it was "time for [him] to f-ck with" her, and that he prayed she would die. Viewed collectively, these statements demonstrate an intent to cause L.L. fear of immediate bodily harm or death. When the record is considered as a whole, the circumstances proved do not support a rational hypothesis that Hill intended only to cause L.L. fear of losing her property. *See Andersen*, 784 N.W.2d at 332 (explaining that circumstantial evidence must be viewed as a whole and not examined in isolation).

Thus, viewing the circumstances proved in the light most favorable to the verdict, and applying the circumstantial-evidence standard, we conclude that there was sufficient evidence to convict Hill of domestic assault-fear because the circumstances proved are "consistent with [Hill's] guilt and inconsistent with any rational hypothesis except that of guilt." *Silvernail*, 831 N.W.2d at 599 (citation omitted).

14

**II.** **The district court erred by issuing a DANCO against Hill during his sentencing hearing and naming R.H. as a protected party because it violated Hill's procedural due-process rights.[4]**

Hill also contends that his procedural due-process rights were violated because the district court failed to hold a separate hearing before issuing the probationary DANCO under Minnesota Statute section 629.75 (2024).[5] The United States and Minnesota Constitutions guarantee the right to due process of law. U.S. Const. amend. XIV, § 1; Minn. Const. art. 1, § 7. "The Due Process Clauses of the U.S. and Minnesota Constitutions require that a party receive adequate notice and an opportunity to be heard before being deprived of life, liberty, or property." *Christopher v. Windom Area Sch. Bd.*, 781 N.W.2d 904, 911 (Minn. App. 2010). Whether procedural due-process rights have been violated is a question of law that we review de novo. *Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012). In evaluating a procedural due-process claim, we first

---

[4] Hill also argues that (1) the district court abused its discretion because it failed to issue the DANCO in a separate proceeding as required by Minnesota Statutes section 629.75, subdivision 1(c), (2) the district court abused its discretion by naming R.H. as a protected victim under the DANCO because his relationship with R.H. was not reasonably related to the purpose of his sentence, and (3) naming R.H. as a protected victim under the DANCO violates his substantive due-process rights because it places an unreasonable restriction on his fundamental right as a parent to make decisions concerning the care, custody, and control of R.H., and because the DANCO was not narrowly tailored to advance the government's interest because it prohibited all contact with R.H. for two years and did not rule out less restrictive alternatives. Because we reverse the issuance of the DANCO on behalf of R.H. on procedural-due-process grounds, we need not address these arguments.

[5] Section 629.75, subdivision 1(1), provides that "[a] domestic abuse no contact order is an order issued by a court against a defendant in a criminal proceeding . . . for domestic abuse as defined in section 518B.01, subdivision 2." Minnesota Statutes section 518B.01, subdivision 2(a)(2) (2022) (the Domestic Abuse Act), defines domestic abuse as "the infliction of fear or imminent physical harm, bodily injury, or assault."

"identify whether the government has deprived the individual of a protected life, liberty, or property interest" and, if so, determine next whether the procedures used were constitutionally adequate. *Id.* "The procedures afforded by the government must provide an individual with notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (quotation omitted).

Hill relies on *State v. Ness*, 834 N.W.2d 177 (Minn. 2013), to support his contention that he was denied procedural due process because the district court did not issue the DANCO in a separate proceeding. In *Ness*, the supreme court rejected the argument that the DANCO statute is facially unconstitutional for failing to provide adequate notice and an opportunity to be heard under the Due Process Clauses of the United States and Minnesota Constitutions. *Id*. at 182-83. The supreme court concluded that the statute is not unconstitutional in all of its applications because it expressly requires that a DANCO hearing be held "immediately following" a proceeding in which any pretrial release or sentencing issues are decided." *Id*. at 183. The court explained that this requirement ensures that a defendant receives notice and an opportunity to be heard through the pretrial-release hearing before the district court imposes a DANCO. *Id*. The supreme court further acknowledged the possibility of an as-applied due-process challenge to the statute, stating that "[t]he issue of whether a particular defendant received sufficient notice is more appropriately resolved in an as-applied challenge in which we can assess the contours of due process against a fully-developed record." *Id.* at 183 n.4.

As an initial matter, the parties agree that by naming R.H. as a protected party in the probationary DANCO, the order deprives Hill of the care, custody, and control over R.H.,

16

which is a liberty interest. *See Rew v. Bergstrom*, 845 N.W.2d 764, 785 (Minn. 2014) (stating that generally, a parent has a liberty interest in the care, custody, and control of his or her children).

Here, Hill raises an as-applied challenge, arguing that the district court violated his procedural due-process rights by failing to comply with the separate hearing requirement set forth in Minnesota Statutes section 629.75, subdivision 1(c). Specifically, Hill contends that he was not provided constitutionally sufficient notice of the conditions imposed by the DANCO because the district court did not conduct a DANCO hearing, did not announce the terms of the order on the record, and did not explain the factual or legal basis for issuing a probationary DANCO protecting R.H. We agree.

Hill was not afforded constitutionally sufficient notice or an opportunity to be heard before the district court imposed a probationary DANCO on behalf of R.H. The state argues that the notice requirement was satisfied because Hill requested a limited DANCO allowing contact with his minor daughter, demonstrating that he "knew it was an issue to be addressed." This argument mischaracterizes the record.

Nothing in the sentencing record indicates that the state or the district court ever suggested that R.H. could, should, or would be protected by a probationary DANCO. To the contrary, the record reflects that all discussion concerning a DANCO related to L.L., the victim. During sentencing, the district court invited the state's comments. The state requested a two-year probationary DANCO, asking that it "be in place as long as possible," but did not specify whom the order was intended to protect. When the district court asked whether the state had communicated with L.L., the state responded that "[s]he still wants a

17

DANCO, she doesn't want any communication with Mr. Hill," reinforcing that the requested order concerned L.L., not R.H.

When defense counsel was given an opportunity to respond, counsel stated: "The other issue that we have is related to the issue of a probationary DANCO. Mr. Hill would request that the Court issue a limited probationary DANCO allowing him contact with the victim as to coordinating visits or communication with his child and allowing him contact with his child." This statement reflects an understanding that the proposed DANCO concerned the victim, L.L., and that any limitation would permit communication with her solely for purposes related to R.H. Nothing in this exchange suggests that Hill was on notice that the district court was considering imposing a separate DANCO protecting R.H.

At the conclusion of the sentencing hearing, the district court stated that Hill was to "have no contact with the victim L.J.L. and the minor child, R.M.H." The court further ordered Hill to "comply with all the terms of any active DANCO, Order for Protection, or Harassment Restraining Order," and added, "There is an active DANCO, so I expect you fully to comply with the DANCO." At that time, the only DANCO in effect was the pretrial DANCO, which by its terms remained in effect until disposition of the criminal case or further order of the court.

Critically, the district court never stated on the record that it was issuing a probationary DANCO, never identified R.H. as a protected party under such an order, never announced the specific terms of any probationary DANCO, and never explained the reasons for imposing one. As a result, Hill had no meaningful notice that a probationary

18

DANCO protecting R.H. was under consideration and no opportunity to be heard on its necessity or scope.

Accordingly, we conclude that the district court violated Hill's procedural due-process rights as-applied by imposing a probationary DANCO for the protection of R.H., and remand to the district court to vacate the portion of the DANCO prohibiting Hill from having contact with R.H.

**III.  The district court erred by entering convictions for two offenses that were committed during a single behavioral incident, in violation of Minnesota Statutes section 609.04, subdivision 1.**

Finally, we address sua sponte the lawfulness of the district court's entry of two convictions under section 609.04, subdivision 1. *See* Minn. R. Crim. P. 28.02, subd. 11; *State v. Westrom*, 6 N.W.3d 145, 161 (Minn. 2024) (considering an issue not raised on appeal); *State v. Cruz*, 997 N.W.2d 537, 556 (Minn. 2023) (same); *State v. Hannuksela*, 452 N.W.2d 668, 673 n.7 (Minn. 1990) (addressing an issue not briefed or raised at oral argument, emphasizing "it is the responsibility of the appellate courts to decide cases in accordance with law, and that responsibility is not to be diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities" (quotation omitted)).  Here, the warrant of commitment reflects that convictions were entered on count 2, domestic assault-fear of immediate bodily harm, and count 3, domestic assault-harm, infliction of bodily harm.  Under Minnesota law, a defendant "may be convicted of either the crime charged or an included offense, but not both."  Minn. Stat. § 609.04, subd. 1.  The proper procedure for district courts "when the defendant is convicted on more than one charge for the same act is for the [district] court to adjudicate formally and impose

sentence on one count only," retaining the guilty verdicts on the remaining charges but not formally adjudicating them. *State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn. 1984). However, "[w]hen [the] official judgment order states that a party has been convicted of or sentenced for more than one included offense," we reverse and remand with instructions to vacate the erroneous conviction. *State v. Pflepsen*, 590 N.W.2d 759, 767 (Minn. 1999); *State v. Crockson*, 854 N.W.2d 244, 248 (Minn. App. 2014), *rev. denied* (Minn. Dec. 16, 2014). Here, Hill should not be convicted of domestic assault-harm because it involves the same criminal act as the domestic assault-fear count for which we have concluded the evidence is sufficient. Accordingly, we reverse and remand to the district court to vacate Hill's adjudication for count 3 domestic assault-harm but leave the jury's finding of guilt intact.

**Affirmed in part, reversed in part, and remanded.**